**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JOHN DOES 192-217

                Plaintiffs,

      v.

THE OHIO STATE UNIVERSITY,

                Defendant.

Case No. 2:21-cv-2527

JURY TRIAL DEMANDED

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs John Does 192-217 file this First Amended Complaint against Defendant, The

Ohio State University ("OSU" or the "University").  This is a companion case to ten settled

cases: ***Michael DiSabato and John Does 1-36 v. The Ohio State University*, Case No. 2:19-cv-**

**02237;** *John Does 37-66 v. The Ohio State University***, Case No. 03165;** *John Does 67-88 v.*

*The Ohio State University, Case No. 04397; John Does 88-94 v. The Ohio State University,*

**Case No. 04624;** *Dave Beaudin, Mathew Barclay and John Does 95-136 v. The Ohio State*

*University,* **Case No. 04634;** *Derek de Jong and John Does 137-139 v. The Ohio State*

*University,* **Case No. 05551,** *John Does 140-150 v. The Ohio State University,* **Case No. 01188**,

*John Doe 32 v. The Ohio State University,* **Case No. 02008,** *John Does 151-166 v. The Ohio*

*State University,* **Case No. 03817, and** *John Does 167-171 v. The Ohio State University,* **Case**

**No. 03817.** This case is also related to case *John Doe 162 v. The Ohio State University,* **Case**

**No. 03817,** which has not settled and remains active, *Alonzo Shavers and Kenneth McHone v.*

*The Ohio State University,* **Case No. 02120,** and *John Does 172-191 and Jane Doe 1 v. The*

*Ohio State University,* **Case No. 02121**. As of April 17, 2020, the date of this Court's Order, ECF No. 151, 2-18-cv-692, none of these Plaintiffs were filed. Plaintiffs are filing this case separately because these are new Plaintiffs to the litigation.

Plaintiffs allege that Defendant violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, as follows:

<u>JURISDICTION AND VENUE</u>

1.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because Plaintiffs allege claims under federal law, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2.       Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

<u>PRELIMINARY STATEMENT</u>

3.       Plaintiffs bring this civil rights lawsuit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* because OSU had actual notice of and was deliberately indifferent to the fact that Richard Strauss, M.D., an OSU employee, tenured faculty member, and the Associate Director of OSU's sports medicine program, sexually assaulted and abused hundreds of male OSU student-athletes and other male OSU undergraduates throughout his almost twenty-year career with the University. OSU officials not only had actual notice of Strauss' criminal and unlawful actions, they aided, abetted, and actively concealed Strauss' sexual predation on OSU's students.

4.       As a threshold matter, Plaintiffs admit they consented to receiving medical treatment while student-athletes at OSU. Plaintiffs, however, did not consent to Strauss doing or saying anything that was medically unwarranted, inappropriate, or unethical. For numerous

reasons described below, Plaintiffs were not in a position to judge Strauss' clinical practices or to avoid him when seeking medical care.

5. Strauss abused Plaintiffs during pre-season physicals and when treating them for injuries, either through the OSU Athletics Department or OSU's Sports Medicine Clinic at Student Health Services. He also sexually harassed student-athletes in the locker rooms and showers of Larkins Hall, where many teams were based, including wrestling, gymnastics, and swimming.

6. On information and belief, OSU assigned Strauss a locker in *every room* used by male athletes for the teams based in Larkins Hall.

7. Strauss also used his access to students to sexually assault/abuse students that were not part of intercollegiate sports.

8. OSU designated Strauss as a team physician for many sports. Student-athletes could not avoid him if they wanted medical treatment. OSU funneled Plaintiffs and other student-athletes to Strauss with assembly-line efficiency, whereupon Strauss cornered and sexually assaulted them. He sexually assaulted/abused most of the Plaintiffs more than once, and some wrestlers between 20-50 times.

9. OSU concealed, intentionally ignored, or disregarded athletes' repeated reports and other widely known information that indicated Strauss was a threat to his male patients. A Graduate Assistant Trainer who overlapped with Strauss only one academic quarter noticed "immediately" that something was "off" with Strauss. "In her view, individuals who overlapped with Strauss for any significant period of time would have had to have their 'ear plugged, eyes shut, and mouth closed not to realize something was off.'" *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, Report of Perkins Coie, LLP, May 15, 2019, p.

104 ("Report"). Officials turned a blind eye to numerous red flags that Strauss was sexually abusing his patients, such as: Strauss insisted upon examining patients without any other staff being present, including students in training; Strauss performed notoriously long and thorough "hernia checks" during team physicals; athletes' openly commented on the fact that Strauss made them drop their pants regardless of their medical needs (e.g., to get a case of cauliflower ear treated); and the fact that Strauss showered with athletes from multiple teams, often took multiple showers a day, and requested (and received) multiple lockers in Larkins Hall.

10.     There were other clear signs of Strauss' predatory behavior. When teams reported for pre-season physicals, Athletics Department personnel set up stations for each station of the physical. Strauss always chose to man the "hernia check" station.  He took an extended amount of time with each athlete patient and examined each patient in a room with the door closed. Strauss' "hernia checks" frequently took several minutes. Some lasted as long as ten or fifteen minutes. A line would form outside of Strauss' exam room as the athletes completed the other stations for their physicals and anxiously waited for Strauss to exam them.  Strauss' prolonged genital exams were well-known to the athletes he examined, Athletics Department personnel, and team coaches. At least one team head coach requested that someone other than Strauss conduct the hernia checks for team physicals because his athletes complained so much about Strauss' methods.

11.     Strauss disguised his sexual assaults in the context of medical examinations.  He frequently positioned Plaintiffs so that his face was at the same height as their crotches. Strauss placed his face so close to his patients that they could feel his breath on their genitals.  Other times he had them sit on a bench and spread their legs; he would then roll across the floor on a wheeled stool and stick his face deep between their legs to perform his exam.  Sometimes

Strauss donned a headlamp and turned off the room lights before putting his head inches away from patients' penises. When Plaintiffs asked Strauss why such in-depth and lengthy genital inspections were necessary, or why he was massaging their genitals, probing their rectums, or doing or saying other harassing and inappropriate things, Strauss came up with many different medical explanations. Hernia and lymph node checks were a common explanation.  When one Plaintiff asked Strauss to explain the room lights off/headlamp behavior, Strauss said he was checking for skin rashes and STDs. He assured the Plaintiff that this technique allowed him to perform the best possible examination for those kinds of problems.

12. Strauss also sexually assaulted students by performing anal and rectal exams that were rigorous, lengthy, and medically unnecessary. Although less common than genital exams, they occurred frequently. They were profoundly embarrassing and humiliating to the Plaintiffs who endured them. Numerous Plaintiffs were assaulted in this manner.

13. Some of the Plaintiffs and other student-athletes reported Strauss' examination methods to team trainers – particularly football trainer Billy Hill. While precise responses differed, the gist was almost always the same: it was not a big deal; Strauss did things his way; Strauss was just being thorough; and/or this had gone on for years.  Other benign explanations were offered. Some Plaintiffs came to believe that Strauss' examinations were a  necessary part of their participation in intercollegiate athletics that was like a "hazing."

14. In April 2018, OSU authorized the law firm of Perkins Coie, LLP to investigate whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. Perkins Coie, LLP conducted its investigation and issued the Report on May 15, 2019.  Plaintiffs were not aware and had no reason to know of the sexual assaults and abuse conduct by Dr. Strauss and the widespread institutional knowledge giving rise to their

causes of action until the report was publicly published. The Report substantiates many of the allegations made by Plaintiffs in this case and in other Title IX cases presently pending before this Court.[1] *See, e.g., Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Snyder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00735-MHW-EPD.  Plaintiffs further note the *Garrett, supra* case is a class action complaint first filed on July 16, 2018, and subsequently filed as a consolidated class action complaint on May 27, 2020, alleging facts and seeking damages similar, and substantively identical, to those sought by Plaintiffs in this case.

15.     John Does 192-217 have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

16.     Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning, and a majority of the Plaintiffs love OSU dearly and remain devoted members of The Buckeye Nation.

17.     Plaintiffs were honored to represent OSU in competitive sports and did their best to continue the University's tradition of excellence.

18.     Plaintiffs attended OSU expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

19.     Plaintiffs believed that OSU would make patient/athlete safety one of the University's primary concerns.

20.     Team physicians hold a special relationship of trust and confidence with the student-athletes they treat.

---

[1] Materials received from Ohio's Medical Board Contents are redacted from the current version of the Report.

21.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty, regardless of whether their patients are actively enrolled at OSU at the time of treatment.

22.     Plaintiffs trusted OSU to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

23.     Plaintiffs trusted OSU to regularly and competently evaluate the quality and integrity of the medical services Strauss provided to Plaintiffs.

24.     Plaintiffs trusted OSU to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

25.     Plaintiffs trusted that OSU personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood the Plaintiffs or other student-athletes were being sexually assaulted, abused, or harassed by Strauss and/or by conditions at Larkins Hall.

26.     Plaintiffs expected OSU, an esteemed institution of higher learning, to investigate the truth about Strauss' conduct in a timely and competent manner, regardless of how unfavorable findings might affect the University's reputation or athletics programs.

27.     Plaintiffs relied on OSU to confront and stop Strauss' sexual abuse of Plaintiffs and other male OSU students.

28.     Plaintiffs relied on OSU to stop the rampant sexual harassment that student-athletes, particularly the wrestling team, had to endure in Larkins Hall between 1978 and 1998.

29.     OSU betrayed Plaintiffs' trust and utterly failed to meet the legal and ethical obligations it owed to Plaintiffs and other OSU students.  At all times relevant to this Complaint, OSU officials with authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Strauss was sexually assaulting and abusing many male OSU athletes he treated.

30.     On information and belief, OSU personnel who failed to implement corrective measures despite having actual knowledge of: (a) the risk that Strauss was sexually assaulting students, and (b) the sexually hostile environment Larkins Hall presented to athletes on the teams housed there included (but were not limited to) Athletic Directors and Assistant Athletic Directors, Head Team Physicians, and team physicians (who were also faculty members).

31.     At all times relevant to this Complaint, OSU maintained a culture of concealment, denial, and unwillingness to investigate sexual abuse and sexual harassment of male athletes at the University.  This culture led to OSU's active concealment of and deliberate indifference towards continuous complaints and reports about Strauss' behavior and the conditions at Larkins Hall. Consequently, Strauss remained hidden in plain sight and continued to abuse Plaintiffs and other patients throughout his career at the University. Plaintiffs on teams housed in Larkins Hall continued to be harassed on a daily basis. Both of these threats to student safety remained unabated for approximately twenty years.

32.     Only within the two years before filing the original Complaint have Plaintiffs realized that Strauss' conduct constituted sexual assault or sexual abuse.

33.     Only within the two years before filing the original Complaint have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge of the risk Strauss presented to the student-athletes he treated.

34.     Only within the two years before filing the original Complaint have Plaintiffs had a reasonable basis for believing OSU intentionally concealed or showed deliberate indifference to the threat Strauss posed to them.

35.     Only within the two years before filing the original Complaint have the Plaintiffs had reason to know that OSU administrators in a position to take corrective measures knew about sexually harassing environment that students and male athletes endured each day in Larkins Hall.

36.     Even if Plaintiffs had realized more than two years ago that Strauss' conduct constituted sexual assault and sexual abuse, Plaintiffs would have had no reasonable basis for alleging or concluding that OSU harmed them separately and independently from the harm that Strauss inflicted on them.  Strauss harmed Plaintiffs by sexually assaulting and abusing them. OSU separately and independently harmed Plaintiffs by failing to protect them from Strauss despite knowing Strauss was substantially likely to be a sexual predator.  Not until within the two years before filing the original Complaint would Plaintiffs' due diligence have allowed them to reasonably infer: (a) what OSU knew about Strauss while Strauss was on the faculty; or (b) what OSU did or failed to do with that information.

37.     Likewise, not until within the two years before filing the original Complaint would the Plaintiffs whose teams practiced in Larkins Hall have known: (a) the extent of OSU's institutional knowledge about the conditions in Larkins Hall; or (b) what OSU did or failed to do with that information.

## THE PARTIES

38.     Defendant The Ohio State University was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

39.    Defendant OSU receives, and at all relevant times received, federal financial assistance. Defendant is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

40.    Most Plaintiffs were enrolled at OSU as students during Strauss' employment with OSU.

41.    Most Plaintiffs participated in OSU intercollegiate sports teams while enrolled at OSU.

42.    Plaintiffs received financial assistance from OSU. Most financial assistance was linked to their participation on OSU's intercollegiate sports teams.

43.    Plaintiff John Doe 192 is a resident of the State of Ohio.

44.    Plaintiff John Doe 192 attended OSU from 1985-1993.

45.    Strauss treated John Doe 192 approximately 1 time while John Doe 192 was a Student at OSU. Strauss sexually assaulted/abused John Doe 192 at least 1 time. Strauss sexually assaulted/abused John Doe 192 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 192's genitals and applied pressure with his fingers to his anus in a manner that made John Doe 192 feel very uncomfortable.

46.    John Doe 192 recalls Strauss repeatedly stroking his penis to the point of erection. Other than John Doe 192, Strauss was the only one in the room at the time.

47.    John Doe 192 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 192 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 192. And John Doe 192 was raised to believe that doctors help their patients, not hurt them.

48.     Before May 15, 2019, John Doe 192 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 192 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 192 on notice that Strauss was a sexual predator.

49.     Before May 15, 2019, John Doe 192 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

50.     After May 15, 2019, John Doe 192 learned that Strauss' examination in which Strauss manipulated John Doe 192's genitals and touched his anus was medically unwarranted, improper, and even criminal. John Doe 192 also learned that Strauss was a serial sexual offender. Then John Doe 192 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

51.     OSU showed more than deliberate indifference by placing John Doe 192 under Strauss' care. OSU betrayed John Doe 192 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 192 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

52.     Further, before contacting and retaining his attorney in April 2021, John Doe 192 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 192 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 192 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 192 on notice that Strauss was a sexual predator.

53.     Before contacting and retaining his attorney in April 2021, John Doe 192 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In April of 2021, when he contacted and retained his attorney, John Doe 192 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 192 also learned that Strauss was a serial sexual offender. Then John Doe 192 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 192 and assaulted many other Ohio State students.

54.     Plaintiff John Doe 193 is a resident of the State of Georgia.

55.     Plaintiff John Doe 193 attended OSU from 1989-1991.

56.     Strauss treated John Doe 193 approximately 1 time while John Doe 193 was a student at OSU. Strauss sexually assaulted/abused John Doe 193 at least 1 time. Strauss sexually assaulted/abused John Doe 193 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 193's genitals in a manner that made John Doe 193 feel very uncomfortable.

57.     John Doe 193 recalls Strauss giving him an extended physical even though he was seeing him for an unrelated sickness or ailments. The exam involved Strauss trying to arouse John Doe 193.

58.     John Doe 193 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 193 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 193. And John Doe 193 was raised to believe that doctors help their patients, not hurt them.

59.     Before May 15, 2019, John Doe 193 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 193 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 193 on notice that Strauss was a sexual predator.

60.     Before May 15, 2019, John Doe 193 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

61.     After May 15, 2019, John Doe 193 learned that Strauss' examination in which Strauss manipulated John Doe 193's genitals was medically unwarranted, improper, and even criminal. John Doe 193 also learned that Strauss was a serial sexual offender. Then John Doe 193 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

62.     OSU showed more than deliberate indifference by placing John Doe 193 under Strauss' care. OSU betrayed John Doe 193 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 193 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

63.     Further, before contacting and retaining his attorney in April 2021, John Doe 193 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 193 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 193 on notice that

Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 193 on notice that Strauss was a sexual predator.

64.     Before contacting and retaining his attorney in April 2021, John Doe 193 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In April of 2021, when he contacted and retained his attorney, John Doe 193 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 193 also learned that Strauss was a serial sexual offender. Then John Doe 193 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 193 and assaulted many other Ohio State students.

65.     Plaintiff John Doe 194 is a resident of the State of Georgia.

66.     Plaintiff John Doe 194 attended OSU from 1984-1990 and was a member of the wrestling team for 4 years while he attended OSU.

67.     Strauss treated John Doe 194 approximately 5 times while John Doe 194 was a student athlete on the wrestling team at OSU. Of those 5 times, Strauss sexually assaulted/abused John Doe 194 at least 1 time. Strauss sexually assaulted/abused John Doe 194 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 194's genitals in a manner that made John Doe 194 feel very uncomfortable.

68.     John Doe 194 recalls Strauss making him disrobe completely naked for the exam and Strauss repeatedly squeezed his genitalia. Then Strauss brought in other medical students

who did the same thing to John Doe 194. The exam involved Strauss trying to arouse John Doe 194.

69.     John Doe 194 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 194 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 194. And John Doe 194 was raised to believe that doctors help their patients, not hurt them.

70.     Before May 15, 2019, John Doe 194 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 194 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 194 on notice that Strauss was a sexual predator.

71.     Before May 15, 2019, John Doe 194 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

72.     After May 15, 2019, John Doe 194 learned that Strauss' examination in which Strauss manipulated John Doe 194's genitals was medically unwarranted, improper, and even criminal. John Doe 194 also learned that Strauss was a serial sexual offender. Then John Doe 194 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

73.     OSU showed more than deliberate indifference by placing John Doe 194 under Strauss' care. OSU betrayed John Doe 194 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 194 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

74.     Further, before contacting and retaining his attorney in May 2021, John Doe 194 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 194 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 194 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 194 on notice that Strauss was a sexual predator.

75.     Before contacting and retaining his attorney in May 2021, John Doe 194 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 194 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 194 also learned that Strauss was a serial sexual offender. Then John Doe 194 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 194 and assaulted many other Ohio State students.

76.     Plaintiff John Doe 195 is a resident of the State of Ohio.

77.     Plaintiff John Doe 195 attended OSU's campus as a prospective athlete for their swimming team. John Doe 195's high school coach was a former All-American diver for OSU and would bring John Doe 195 to OSU's campus to practice when John Doe 195 was in high

school from his freshman year through his senior year, 1978-1981, and OSU invited John Doe 195 to apply to OSU during these vists.

78.     Strauss treated John Doe 195 approximately 10 times while John Doe 195 was on campus at OSU between 1978-1981. Of those 10 times, Strauss sexually assaulted/abused John Doe 195 every time. Strauss sexually assaulted/abused John Doe 195 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 195's penis in a stroking manner that made John Doe 195 feel very uncomfortable. Strauss also examined his anus, digitally penetrating him, while continuing to stroke his penis pressing his body up against John Doe 195 until John Doe 195 ejaculated.

79.     John Doe 195 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 195 and one exam also went as far as Strauss orally raping John Doe 195 and telling John Doe 195 it was for the purpose of determining if John Doe 195's penis was working properly.

80.     John Doe 195 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 195 expected that OSU demanded the same excellence from Strauss that they demanded from anyone on their campus. And John Doe 195 was raised to believe that doctors help their patients, not hurt them.

81.     Before May 15, 2019, John Doe 195 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 195 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 195 on notice that Strauss was a sexual predator.

82.     Before May 15, 2019, John Doe 195 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

83.     After May 15, 2019, John Doe 195 learned that Strauss' examinations in which Strauss manipulated John Doe 195's genitals, digitally penetrated him, and orally raped him were medically unwarranted, improper, and even criminal. John Doe 195 also learned that Strauss was a serial sexual offender. Then John Doe 195 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many others on OSU's campus.

84.     OSU showed more than deliberate indifference by placing John Doe 195 under Strauss' care. OSU betrayed John Doe 195 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 195 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

85.     Further, before contacting and retaining his attorney in May 2021, John Doe 195 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 195 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 195 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 195 on notice that Strauss was a sexual predator.

86.     Before contacting and retaining his attorney in May 2021, John Doe 195 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For

decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 195 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 195 also learned that Strauss was a serial sexual offender. Then John Doe 195 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 195 and assaulted many other Ohio State students.

87.　　Plaintiff John Doe 196 is a resident of the State of Ohio.

88.　　Plaintiff John Doe 196 attended OSU from 1994-1999.

89.　　Strauss treated John Doe 196 approximately 1 time while John Doe 196 was a student at OSU in 1996. Strauss sexually assaulted/abused John Doe 196 1 time. Strauss sexually assaulted/abused John Doe 196 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 196's genitals in a manner that made John Doe 196 feel very uncomfortable. John Doe 196 went to the health center to see Strauss because he though he had a tumor under his nipple. After taking his shirt off to have his chest examined. Strauss then asked him to drop his pants.

90.　　John Doe 196 recalls Strauss giving him this extended physical even though he was seeing him for an unrelated sickness or ailments. The exam involved Strauss trying to arouse John Doe 196.

91.　　John Doe 196 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 196 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 196. And John Doe 196 was raised to believe that doctors help their patients, not hurt them.

92.     Before May 15, 2019, John Doe 196 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 196 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 196 on notice that Strauss was a sexual predator.

93.     Before May 15, 2019, John Doe 196 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

94.     After May 15, 2019, John Doe 196 learned that Strauss' examination in which Strauss manipulated John Doe 196's genitals was medically unwarranted, improper, and even criminal. John Doe 196 also learned that Strauss was a serial sexual offender. Then John Doe 196 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

95.     OSU showed more than deliberate indifference by placing John Doe 196 under Strauss' care. OSU betrayed John Doe 196 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 196 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

96.     Further, before contacting and retaining his attorney in May 2021, John Doe 196 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations. John Doe 196 was not aware of prior, credible allegations that Strauss had sexually assaulted other students. No action taken by Strauss put John Doe 196 on notice that

Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 196 on notice that Strauss was a sexual predator.

97.     Before contacting and retaining his attorney in May 2021, John Doe 196 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 196 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 196 also learned that Strauss was a serial sexual offender. Then John Doe 196 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 196 and assaulted many other Ohio State students.

98.     Plaintiff John Doe 197 is a resident of the State of Louisiana.

99.     Plaintiff John Doe 197 attended OSU from 1985-1990 and was a member of the wrestling team for 5 years while he attended OSU.

100.     Strauss treated John Doe 197 approximately 8 times while John Doe 197 was a student athlete on the wrestling team at OSU. Of those 8 times, Strauss sexually assaulted/abused John Doe 197 4 times. Strauss sexually assaulted/abused John Doe 197 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 197's penis and testicles in a manner that made John Doe 197 feel very uncomfortable. Strauss made John Doe 197 undress completely and told him it was so he could look for skin problems and lesions. Strauss also seemed aroused during the exams because he would move close to John Doe 197 while grabbing John Doe 197's penis and testicles.

101.     John Doe 197 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 197. John Doe 197 remembers Strauss also asking him in one of the exams if he ever became sexually aroused while wrestling. Strauss also took pictures of John Doe 197.

102.     John Doe 197 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 197 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 197. And John Doe 197 was raised to believe that doctors help their patients, not hurt them.

103.     Before May 15, 2019, John Doe 197 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 197 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 197 on notice that Strauss was a sexual predator.

104.     Before May 15, 2019, John Doe 197 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

105.     After May 15, 2019, John Doe 197 learned that Strauss' examinations in which Strauss manipulated John Doe 197's genitals were medically unwarranted, improper, and even criminal. John Doe 197 also learned that Strauss was a serial sexual offender. Then John Doe 197 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

106.     OSU showed more than deliberate indifference by placing John Doe 197 under Strauss' care. OSU betrayed John Doe 197 in the most extreme possible manner. If OSU had

exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 197 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

107.    Further, before contacting and retaining his attorney in May 2021, John Doe 197 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations. John Doe 197 was not aware of prior, credible allegations that Strauss had sexually assaulted other students. No action taken by Strauss put John Doe 197 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 197 on notice that Strauss was a sexual predator.

108.    Before contacting and retaining his attorney in May 2021, John Doe 197 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 197 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 197 also learned that Strauss was a serial sexual offender. Then John Doe 197 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 197 and assaulted many other Ohio State students.

109.    Plaintiff John Doe 198 is a resident of the State of Georgia.

110.    Plaintiff John Doe 198 attended OSU from 1983-1987 and was a member of the basketball team for 3 years while he attended OSU.

111.     Strauss treated John Doe 198 approximately 2 times while John Doe 198 was a student athlete on the basketball team at OSU. Of those 2 times, Strauss sexually assaulted/abused John Doe 198 both times. Strauss sexually assaulted/abused John Doe 198 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 198's genitals in a manner that made John Doe 198 feel very uncomfortable. John Doe 198 was seeing Strauss for tightness in his legs and Strauss rubbed his legs before going to his groin and groping John Doe 198's genitals. John Doe 198 started to get aroused and Strauss reassured him he had nothing to worry about and continued with his exam.

112.     John Doe 198 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 198.

113.     John Doe 198 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 198 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 198. And John Doe 198 was raised to believe that doctors help their patients, not hurt them.

114.     Before May 15, 2019, John Doe 198 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 198 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 198 on notice that Strauss was a sexual predator.

115.     Before May 15, 2019, John Doe 198 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

116.    After May 15, 2019, John Doe 198 learned that Strauss' examinations in which Strauss manipulated John Doe 198's genitals were medically unwarranted, improper, and even criminal. John Doe 198 also learned that Strauss was a serial sexual offender. Then John Doe 198 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

117.    OSU showed more than deliberate indifference by placing John Doe 198 under Strauss' care. OSU betrayed John Doe 198 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 198 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

118.    Further, before contacting and retaining his attorney in May 2021, John Doe 198 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 198 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 198 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 198 on notice that Strauss was a sexual predator.

119.    Before contacting and retaining his attorney in May 2021, John Doe 198 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 198 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 198 also learned that Strauss was a serial sexual offender. Then John Doe 198 learned that

Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 198 and assaulted many other Ohio State students.

120.  Plaintiff John Doe 199 is a resident of the State of Ohio.

121.  Plaintiff John Doe 199 attended OSU from 1990-1994 and was a member of the men's volleyball team for 4 years while he attended OSU.

122.  Strauss treated John Doe 199 approximately 6 times while John Doe 199 was a student athlete on the men's volleyball team at OSU. Of those 6 times, Strauss sexually assaulted/abused John Doe 199 one time. Strauss sexually assaulted/abused John Doe 199 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 199's genitals in a manner that made John Doe 199 feel very uncomfortable.

123.  John Doe 199 recalls Strauss giving him an extended physical even though he was seeing him for an unrelated sickness or ailments. The exam involved Strauss trying to arouse John Doe 199.

124.  John Doe 199 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 199 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 199. And John Doe 199 was raised to believe that doctors help their patients, not hurt them.

125.  Before May 15, 2019, John Doe 199 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 199 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 199 on notice that Strauss was a sexual predator.

126.    Before May 15, 2019, John Doe 199 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

127.    After May 15, 2019, John Doe 199 learned that Strauss' examination in which Strauss manipulated John Doe 199's genitals was medically unwarranted, improper, and even criminal. John Doe 199 also learned that Strauss was a serial sexual offender. Then John Doe 199 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

128.    OSU showed more than deliberate indifference by placing John Doe 199 under Strauss' care. OSU betrayed John Doe 199 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 199 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

129.    Further, before contacting and retaining his attorney in May 2021, John Doe 199 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 199 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 199 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 199 on notice that Strauss was a sexual predator.

130.    Before contacting and retaining his attorney in May 2021, John Doe 199 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In

May of 2021, when he contacted and retained his attorney, John Doe 199 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 199 also learned that Strauss was a serial sexual offender. Then John Doe 199 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 199 and assaulted many other Ohio State students.

131.    Plaintiff John Doe 200 is a resident of the State of North Carolina.

132.    Plaintiff John Doe 200 attended OSU from 1994-1997 and was a member of the football team for 3 years while he attended OSU.

133.    Strauss treated John Doe 200 approximately 10 times while John Doe 200 was a student athlete on the football team at OSU. Of those 10 times, Strauss sexually assaulted/abused John Doe 200 every time. Strauss sexually assaulted/abused John Doe 200 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 200's penis and testicles in a manner that made John Doe 200 feel very uncomfortable. Strauss also told John Doe 200 he had to check his spine for scoliosis and had him bend over. While doing so Strauss grabbed and touched John Doe 200's buttocks.

134.    John Doe 200 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss stroking John Doe 200's penis trying to arouse John Doe 200.

135.    John Doe 200 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 200 expected that OSU demanded the same excellence from Strauss that

they demanded from John Doe 200. And John Doe 200 was raised to believe that doctors help their patients, not hurt them.

136.    Before May 15, 2019, John Doe 200 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 200 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 200 on notice that Strauss was a sexual predator.

137.    Before May 15, 2019, John Doe 200 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

138.    After May 15, 2019, John Doe 200 learned that Strauss' examinations in which Strauss manipulated John Doe 200's genitals and touched him were medically unwarranted, improper, and even criminal. John Doe 200 also learned that Strauss was a serial sexual offender. Then John Doe 200 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

139.    OSU showed more than deliberate indifference by placing John Doe 200 under Strauss' care. OSU betrayed John Doe 200 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 200 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

140.    Further, before contacting and retaining his attorney in May 2021, John Doe 200 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 200 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 200 on notice that

29

Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John

Doe 200 on notice that Strauss was a sexual predator.

141.    Before contacting and retaining his attorney in May 2021, John Doe 200 had no

reason to suspect that one or more Ohio State administrators, who could have instituted

corrective measures, knew Strauss was a sexual predator while acting as team physician. For

decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In

May of 2021, when he contacted and retained his attorney, John Doe 200 learned that Strauss

conducted medical exams that were medically unwarranted, improper, and even criminal. John

Doe 200 also learned that Strauss was a serial sexual offender. Then John Doe 200 learned that

Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio

State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe

200 and assaulted many other Ohio State students.

142.    Plaintiff John Doe 201 is a resident of the State of Ohio.

143.    Plaintiff John Doe 201 attended OSU from 1978-1982 and was a member of the

diving team for 5 years while he attended OSU.

144.    Strauss treated John Doe 201 approximately 4 times while John Doe 201 was a

student athlete on the diving team at OSU. Of those 4 times, Strauss sexually assaulted/abused

John Doe 201 every time. Strauss sexually assaulted/abused John Doe 201 by conducting long

genital exams where Strauss would excessively fondle and move his hands around John Doe

201's penis and testicles in a manner that made John Doe 201 feel very uncomfortable. Strauss

also told John Doe 201 that he had to check him for hemorrhoids and he digitally penetrated

John Doe 201.

145.    John Doe 201 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 201.

146.    John Doe 201 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 201 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 201. And John Doe 201 was raised to believe that doctors help their patients, not hurt them.

147.    Before May 15, 2019, John Doe 201 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 201 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 201 on notice that Strauss was a sexual predator.

148.    Before May 15, 2019, John Doe 201 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

149.    After May 15, 2019, John Doe 201 learned that Strauss' examinations in which Strauss manipulated John Doe 201's genitals and digitally penetrated him were medically unwarranted, improper, and even criminal. John Doe 201 also learned that Strauss was a serial sexual offender. Then John Doe 201 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

150.    OSU showed more than deliberate indifference by placing John Doe 201 under Strauss' care. OSU betrayed John Doe 201 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 201 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

151.     Further, before contacting and retaining his attorney in May 2021, John Doe 201 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 201 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 201 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 201 on notice that Strauss was a sexual predator.

152.     Before contacting and retaining his attorney in May 2021, John Doe 201 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 201 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 201 also learned that Strauss was a serial sexual offender. Then John Doe 201 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 201 and assaulted many other Ohio State students.

153.     Plaintiff John Doe 202 is a resident of the State of Ohio.

154.     Plaintiff John Doe 202 attended OSU from 1987-1992 and was a member of the track and field team for 5 years while he attended OSU.

155.     Strauss treated John Doe 202 approximately 1 time while John Doe 202 was a student athlete on the track and field team at OSU. Strauss sexually assaulted/abused John Doe

202 1 time. Strauss sexually assaulted/abused John Doe 202 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 202's penis and testicles in a manner that made John Doe 202 feel very uncomfortable.

156.    John Doe 202 recalls Strauss giving him an extended physical even though he was seeing him for an unrelated sickness or ailments, in this instance a lower leg injury. The exam involved Strauss trying to arouse John Doe 202.

157.    John Doe 202 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 202 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 202. And John Doe 202 was raised to believe that doctors help their patients, not hurt them.

158.    Before May 15, 2019, John Doe 202 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 202 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 202 on notice that Strauss was a sexual predator.

159.    Before May 15, 2019, John Doe 202 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

160.    After May 15, 2019, John Doe 202 learned that Strauss' examination in which Strauss manipulated John Doe 202's genitals was medically unwarranted, improper, and even criminal. John Doe 202 also learned that Strauss was a serial sexual offender. Then John Doe 202 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

161.     OSU showed more than deliberate indifference by placing John Doe 202 under Strauss' care. OSU betrayed John Doe 202 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 202 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

162.     Further, before contacting and retaining his attorney in May 2021, John Doe 202 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 202 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 202 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 202 on notice that Strauss was a sexual predator.

163.     Before contacting and retaining his attorney in May 2021, John Doe 202 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 202 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 202 also learned that Strauss was a serial sexual offender. Then John Doe 202 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 202 and assaulted many other Ohio State students.

164.     Plaintiff John Doe 203 is a resident of the State of Texas.

165.    Plaintiff John Doe 203 attended OSU from 1986-1987 and was a member of the wrestling team for 2 years and the football team for 4 years while he attended OSU.

166.    Strauss treated John Doe 203 approximately 7 times while John Doe 203 was a student athlete on the wrestling and football teams at OSU. Of those 7 times, Strauss sexually assaulted/abused John Doe 203 every time. Strauss sexually assaulted/abused John Doe 203 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 203's genitals in a manner that made John Doe 203 feel very uncomfortable. One of the exams involved an STD check where Strauss swabbed John Doe 203's penis and made comments about how that was his favorite part. During the procedure, Strauss held onto John Doe 203's penis for a long time and continued to touch his testicles.

167.    John Doe 203 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 203.

168.    John Doe 203 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 203 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 203. And John Doe 203 was raised to believe that doctors help their patients, not hurt them.

169.    Before May 15, 2019, John Doe 203 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 203 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 203 on notice that Strauss was a sexual predator.

170.    Before May 15, 2019, John Doe 203 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

171.    After May 15, 2019, John Doe 203 learned that Strauss' examinations in which Strauss manipulated John Doe 203's genitals were medically unwarranted, improper, and even criminal. John Doe 203 also learned that Strauss was a serial sexual offender. Then John Doe 203 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

172.    OSU showed more than deliberate indifference by placing John Doe 203 under Strauss' care. OSU betrayed John Doe 203 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 203 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

173.    Further, before contacting and retaining his attorney in May 2021, John Doe 203 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 203 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 203 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 203 on notice that Strauss was a sexual predator.

174.    Before contacting and retaining his attorney in May 2021, John Doe 203 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In

May of 2021, when he contacted and retained his attorney, John Doe 203 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 203 also learned that Strauss was a serial sexual offender. Then John Doe 203 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 203 and assaulted many other Ohio State students.

175.    Plaintiff John Doe 204 is a resident of the State of North Carolina.

176.    Plaintiff John Doe 204 attended OSU from 1990-1995 and was a member of the track and field team for 3 years while he attended OSU.

177.    Strauss treated John Doe 204 approximately 1 time while John Doe 204 was a student athlete on the track and field team at OSU. Strauss sexually assaulted/abused John Doe 204 1 time. Strauss sexually assaulted/abused John Doe 204 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 204's genitals and grabbing his buttocks in a manner that made John Doe 204 feel very uncomfortable.

178.    John Doe 204 recalls Strauss giving him an extended physical even though he was seeing him for an unrelated sickness or ailments. The exam involved Strauss trying to arouse John Doe 204 by fondling him and making comments about his physique. John Doe 204 also remembers Strauss showering with the team.

179.    John Doe 204 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 204 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 204. And John Doe 204 was raised to believe that doctors help their patients, not hurt them.

180.     Before May 15, 2019, John Doe 204 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 204 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 204 on notice that Strauss was a sexual predator.

181.     Before May 15, 2019, John Doe 204 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

182.     After May 15, 2019, John Doe 204 learned that Strauss' examination in which Strauss manipulated John Doe 204's genitals was medically unwarranted, improper, and even criminal. John Doe 204 also learned that Strauss was a serial sexual offender. Then John Doe 204 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

183.     OSU showed more than deliberate indifference by placing John Doe 204 under Strauss' care. OSU betrayed John Doe 204 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 204 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

184.     Further, before contacting and retaining his attorney in May 2021, John Doe 204 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 204 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 204 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 204 on notice that Strauss was a sexual predator.

185.     Before contacting and retaining his attorney in May 2021, John Doe 204 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 204 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 204 also learned that Strauss was a serial sexual offender. Then John Doe 204 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 204 and assaulted many other Ohio State students.

186.     Plaintiff John Doe 205 is a resident of the State of Ohio.

187.     Plaintiff John Doe 205 attended OSU from 1986-1989 and was the head student trainer for the wrestling team.

188.     Strauss treated John Doe 205 approximately 1 time while John Doe 205 was a student at OSU. Strauss sexually assaulted/harassed/abused John Doe 205 multiple times. Strauss sexually assaulted/harassed/abused John Doe 205 by making sexual comments and rubbing his shoulder and back threatening that he would have him removed from his athletic trainer position if he doesn't do everything Strauss tells him. Strauss would continually make comments to John Doe 205 and expose himself to him trying to get John Doe 205 to look at him. Strauss also took pictures of John Doe 205.

189.     John Doe 205 felt uneasy around Strauss. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 205 expected that OSU demanded the same excellence from Strauss that they demanded

from John Doe 205. And John Doe 205 was raised to believe that doctors help their patients, not hurt them.

190.     Before May 15, 2019, John Doe 205 did not know Strauss had sexually assaulted/harassed him. In short, nothing Strauss did placed John Doe 205 on notice that Strauss might have been sexually assaulting/harassing him. Likewise, OSU did nothing to put John Doe 205 on notice that Strauss was a sexual predator.

191.     Before May 15, 2019, John Doe 205 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

192.     After May 15, 2019, John Doe 205 learned that Strauss' examination was medically unwarranted, improper, and even criminal. John Doe 205 also learned that Strauss was a serial sexual offender. Then John Doe 205 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

193.     OSU showed more than deliberate indifference by placing John Doe 205 under Strauss' care. OSU betrayed John Doe 205 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 205 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

194.     Further, before contacting and retaining his attorney in May 2021, John Doe 205 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 205 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 205 on notice that

Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 205 on notice that Strauss was a sexual predator.

195.    Before contacting and retaining his attorney in May 2021, John Doe 205 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 205 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 205 also learned that Strauss was a serial sexual offender. Then John Doe 205 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 205 and assaulted many other Ohio State students.

196.    Plaintiff John Doe 206 is a resident of the State of Texas.

197.    Plaintiff John Doe 206 attended OSU from 1991-1994 and was a member of the football team for 3 years while he attended OSU.

198.    Strauss treated John Doe 206 approximately 4 times while John Doe 206 was a student athlete on the football team at OSU. Of those 4 times, Strauss sexually assaulted/abused John Doe 206 each time. Strauss sexually assaulted/abused John Doe 206 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 206's genitals in a manner that made John Doe 206 feel very uncomfortable.

199.    John Doe 206 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 206.

41

200.    John Doe 206 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 206 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 206. And John Doe 206 was raised to believe that doctors help their patients, not hurt them.

201.    Before May 15, 2019, John Doe 206 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 206 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 206 on notice that Strauss was a sexual predator.

202.    Before May 15, 2019, John Doe 206 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

203.    After May 15, 2019, John Doe 206 learned that Strauss' examinations in which Strauss manipulated John Doe 206's genitals were medically unwarranted, improper, and even criminal. John Doe 206 also learned that Strauss was a serial sexual offender. Then John Doe 206 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

204.    OSU showed more than deliberate indifference by placing John Doe 206 under Strauss' care. OSU betrayed John Doe 206 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 206 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

205.     Further, before contacting and retaining his attorney in May 2021, John Doe 206 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 206 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 206 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 206 on notice that Strauss was a sexual predator.

206.     Before contacting and retaining his attorney in May 2021, John Doe 206 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 206 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 206 also learned that Strauss was a serial sexual offender. Then John Doe 206 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 206 and assaulted many other Ohio State students.

207.     Plaintiff John Doe 207 is a resident of the State of Ohio.

208.     Plaintiff John Doe 207 attended OSU from 1987-1993 and was a member of the track and field team for 3 years while he attended OSU.

209.     Strauss treated John Doe 207 approximately 3 times while John Doe 207 was a student athlete on the track and field team at OSU. Of those 3 times, Strauss sexually assaulted/abused John Doe 207 every time. Strauss sexually assaulted/abused John Doe 207 by conducting long genital exams where Strauss would excessively fondle and move his hands

around John Doe 207's testicles and penis in a manner that made John Doe 207 feel very uncomfortable. Strauss would sit with his face level at John Doe 207's genitals and touched each testicle individually and pulled his penis up and down. Strauss also asked John Doe 207 to turn around while he examined his shoulders, he pulled his buttocks apart and palpated his anus. Strauss also kept commenting on how good of shape he was in. Strauss also showered with the team several times while John Doe 207 was in there.

210.    John Doe 207 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 207.

211.    John Doe 207 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 207 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 207. And John Doe 207 was raised to believe that doctors help their patients, not hurt them.

212.    Before May 15, 2019, John Doe 207 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 207 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 207 on notice that Strauss was a sexual predator.

213.    Before May 15, 2019, John Doe 207 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

214.    After May 15, 2019, John Doe 207 learned that Strauss' examinations in which Strauss manipulated John Doe 207's genitals and touched his anus were medically unwarranted,

44

improper, and even criminal. John Doe 207 also learned that Strauss was a serial sexual offender. Then John Doe 207 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

215.    OSU showed more than deliberate indifference by placing John Doe 207 under Strauss' care. OSU betrayed John Doe 207 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 207 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

216.    Further, before contacting and retaining his attorney in May 2021, John Doe 207 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 207 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 207 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 207 on notice that Strauss was a sexual predator.

217.    Before contacting and retaining his attorney in May 2021, John Doe 207 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 207 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 207 also learned that Strauss was a serial sexual offender. Then John Doe 207 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio

State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 207 and assaulted many other Ohio State students.

218.    Plaintiff John Doe 208 is a resident of the State of Ohio.

219.    Plaintiff John Doe 208 attended OSU from 1992-1996.

220.    Strauss treated John Doe 208 approximately 1 time while John Doe 208 was a student at OSU. Strauss sexually assaulted/abused John Doe 208 1 time. Strauss sexually assaulted/abused John Doe 208 by digitally penetrating him in a manner that made John Doe 208 feel very uncomfortable. John Doe 208 went to see Strauss for an exam where Strauss told him he had anal warts and need to freeze them off with liquid nitrogen. During his procedure Strauss digitally penetrated him.

221.    The exam involved Strauss trying to arouse John Doe 208.

222.    John Doe 208 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 208 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 208. And John Doe 208 was raised to believe that doctors help their patients, not hurt them.

223.    Before May 15, 2019, John Doe 208 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 208 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 208 on notice that Strauss was a sexual predator.

224.    Before May 15, 2019, John Doe 208 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

225.    After May 15, 2019, John Doe 208 learned that Strauss' examination in which Strauss digitally penetrated John Doe 208 was medically unwarranted, improper, and even criminal. John Doe 208 also learned that Strauss was a serial sexual offender. Then John Doe 208 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

226.    OSU showed more than deliberate indifference by placing John Doe 208 under Strauss' care. OSU betrayed John Doe 208 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 208 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

227.    Further, before contacting and retaining his attorney in May 2021, John Doe 208 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 208 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 208 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 208 on notice that Strauss was a sexual predator.

228.    Before contacting and retaining his attorney in May 2021, John Doe 208 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 208 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 208 also learned that Strauss was a serial sexual offender. Then John Doe 208 learned that

Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 208 and assaulted many other Ohio State students.

229.    Plaintiff John Doe 209 is a resident of the State of Ohio.

230.    Plaintiff John Doe 209 attended OSU from 1975-1982.

231.    Strauss saw John Doe 209 approximately 3 times while John Doe 209 was a student at OSU. Of those 3 times, Strauss sexually assaulted/harassed/abused John Doe 209 every time. Strauss sexually assaulted/harassed/abused John Doe 209 by exposing himself to John Doe 209 and openly masturbating in the shower next to him. Strauss would lather his body in the shower while moving closer to John Doe 209, trying to arouse him. Strauss would also stalk John Doe 209 into the locker room at Larkins Hall and touch himself while John Doe 209 was undressing or showering.

232.    John Doe 209 felt uneasy around Strauss. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 209 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 209. And John Doe 209 was raised to believe that doctors help their patients, not hurt them.

233.    Before May 15, 2019, John Doe 209 did not know Strauss had sexually assaulted/harassed him. In short, nothing Strauss did placed John Doe 209 on notice that Strauss might have been sexually assaulting/harassing him. Likewise, OSU did nothing to put John Doe 209 on notice that Strauss was a sexual predator.

234. Before May 15, 2019, John Doe 209 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

235. After May 15, 2019, John Doe 209 learned that Strauss' actions were unwarranted, improper, and even criminal. John Doe 209 also learned that Strauss was a serial sexual offender. Then John Doe 209 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

236. OSU showed more than deliberate indifference by placing John Doe 209 around Strauss. OSU betrayed John Doe 209 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons, OSU never would have exposed John Doe 209 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting.

237. Further, before contacting and retaining his attorney in May 2021, John Doe 209 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations. John Doe 209 was not aware of prior, credible allegations that Strauss had sexually assaulted other students. No action taken by Strauss put John Doe 209 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 209 on notice that Strauss was a sexual predator.

238. Before contacting and retaining his attorney in May 2021, John Doe 209 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 209 learned that Strauss

49

conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 209 also learned that Strauss was a serial sexual offender. Then John Doe 209 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 209 and assaulted many other Ohio State students.

239.    Plaintiff John Doe 210 is a resident of the State of Ohio.

240.    Plaintiff John Doe 210 attended OSU from 1995-1999 and was a member of the lacrosse team for 4 years while he attended OSU.

241.    Strauss treated John Doe 210 approximately 10 times while John Doe 210 was a student athlete on the lacrosse team at OSU. Of those 10 times, Strauss sexually assaulted/abused John Doe 210 8 times. Strauss sexually assaulted/abused John Doe 210 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 210's genitals in a manner that made John Doe 210 feel very uncomfortable. Strauss would grab his genitals and ask if it hurt or how it felt or if it was okay.

242.    John Doe 210 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 210.

243.    John Doe 210 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 210 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 210. And John Doe 210 was raised to believe that doctors help their patients, not hurt them.

244. Before May 15, 2019, John Doe 210 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 210 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 210 on notice that Strauss was a sexual predator.

245. Before May 15, 2019, John Doe 210 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

246. After May 15, 2019, John Doe 210 learned that Strauss' examinations in which Strauss manipulated John Doe 210's genitals were medically unwarranted, improper, and even criminal. John Doe 210 also learned that Strauss was a serial sexual offender. Then John Doe 210 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

247. OSU showed more than deliberate indifference by placing John Doe 210 under Strauss' care. OSU betrayed John Doe 210 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 210 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

248. Further, before contacting and retaining his attorney in May 2021, John Doe 210 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 210 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 210 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 210 on notice that Strauss was a sexual predator.

249.     Before contacting and retaining his attorney in May 2021, John Doe 210 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 210 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 210 also learned that Strauss was a serial sexual offender. Then John Doe 210 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 210 and assaulted many other Ohio State students.

250.     Plaintiff John Doe 211 is a resident of the State of Ohio.

251.     Plaintiff John Doe 211 attended OSU from 1983-1990 and was a member of the wrestling team for 3 years while he attended OSU.

252.     Strauss treated John Doe 211 approximately 12 times while John Doe 211 was a student athlete on the wrestling team at OSU. Of those 12 times, Strauss sexually assaulted/abused John Doe 211 3 times. Strauss sexually assaulted/abused John Doe 211 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 211's genitals in a manner that made John Doe 211 feel very uncomfortable. Strauss was always lingering around John Doe 211's genitals for an extended period of time. During one of the exams, Strauss placed his face an inch away from John Doe 211's penis. He was continually moving and massaging John Doe 211's penis in the exams. Strauss even made the comment that John Doe 211 had done wonders with his body and commented on his tan.

253.     The exams involved Strauss trying to arouse John Doe 211. John Doe 211 also remembers Strauss continually showering with the team and touching himself while doing so.

254.     John Doe 211 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 211 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 211. And John Doe 211 was raised to believe that doctors help their patients, not hurt them.

255.     Before May 15, 2019, John Doe 211 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 211 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 211 on notice that Strauss was a sexual predator.

256.     Before May 15, 2019, John Doe 211 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

257.     After May 15, 2019, John Doe 211 learned that Strauss' examinations in which Strauss manipulated John Doe 211's genitals were medically unwarranted, improper, and even criminal. John Doe 211 also learned that Strauss was a serial sexual offender. Then John Doe 211 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

258.     OSU showed more than deliberate indifference by placing John Doe 211 under Strauss' care. OSU betrayed John Doe 211 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 211 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

259.     Further, before contacting and retaining his attorney in May 2021, John Doe 211 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 211 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 211 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 211 on notice that Strauss was a sexual predator.

260.     Before contacting and retaining his attorney in May 2021, John Doe 211 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 211 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 211 also learned that Strauss was a serial sexual offender. Then John Doe 211 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 211 and assaulted many other Ohio State students.

261.     Plaintiff John Doe 212 is a resident of the State of Ohio.

262.     Plaintiff John Doe 212 attended OSU from 1994-1995 and was a member of the basketball team for 1 year while he attended OSU.

263.     Strauss treated John Doe 212 approximately 5 times while John Doe 212 was a student athlete on the basketball team at OSU. Of those 5 times, Strauss sexually

assaulted/abused John Doe 212 3 times. Strauss sexually assaulted/abused John Doe 212 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 212's genitals in a manner that made John Doe 212 feel very uncomfortable. John Doe 212 remembers Strauss commenting about the his genitals and saying "wow".

264.    John Doe 212 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 212.

265.    John Doe 212 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 212 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 212. And John Doe 212 was raised to believe that doctors help their patients, not hurt them.

266.    Before May 15, 2019, John Doe 212 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 212 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 212 on notice that Strauss was a sexual predator.

267.    Before May 15, 2019, John Doe 212 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

268.    After May 15, 2019, John Doe 212 learned that Strauss' examinations in which Strauss manipulated John Doe 212's genitals were medically unwarranted, improper, and even criminal. John Doe 212 also learned that Strauss was a serial sexual offender. Then John Doe

212 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

269.    OSU showed more than deliberate indifference by placing John Doe 212 under Strauss' care. OSU betrayed John Doe 212 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 212 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

270.    Further, before contacting and retaining his attorney in May 2021, John Doe 212 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 212 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 212 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 212 on notice that Strauss was a sexual predator.

271.    Before contacting and retaining his attorney in May 2021, John Doe 212 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 212 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 212 also learned that Strauss was a serial sexual offender. Then John Doe 212 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 212 and assaulted many other Ohio State students.

272.     Plaintiff John Doe 213 is a resident of the State of New York.

273.     Plaintiff John Doe 213 attended OSU from 1991-1993 and was a member of the volleyball team for 3 years while he attended OSU.

274.     Strauss treated John Doe 213 approximately 3 times while John Doe 213 was a student athlete on the volleyball team at OSU. Of those 3 times, Strauss sexually assaulted/abused John Doe 213 3 times. Strauss sexually assaulted/abused John Doe 213 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 213's genitals in a manner that made John Doe 213 feel very uncomfortable. Strauss prescribed a medication to John Doe 213 that kept making him break out in a rash. Every time John Doe 213 went back to see Strauss about the rash, Strauss grabbed and pulled on his penis and required a genital exam.

275.     John Doe 213 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 213.

276.     John Doe 213 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 213 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 213. And John Doe 213 was raised to believe that doctors help their patients, not hurt them.

277.     Before May 15, 2019, John Doe 213 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 213 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 213 on notice that Strauss was a sexual predator.

278.    Before May 15, 2019, John Doe 213 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

279.    After May 15, 2019, John Doe 213 learned that Strauss' examinations in which Strauss manipulated John Doe 213's genitals were medically unwarranted, improper, and even criminal. John Doe 213 also learned that Strauss was a serial sexual offender. Then John Doe 213 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

280.    OSU showed more than deliberate indifference by placing John Doe 213 under Strauss' care. OSU betrayed John Doe 213 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 213 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

281.    Further, before contacting and retaining his attorney in May 2021, John Doe 213 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 213 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 213 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 213 on notice that Strauss was a sexual predator.

282.    Before contacting and retaining his attorney in May 2021, John Doe 213 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In

May of 2021, when he contacted and retained his attorney, John Doe 213 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 213 also learned that Strauss was a serial sexual offender. Then John Doe 213 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 213 and assaulted many other Ohio State students.

283.    Plaintiff John Doe 214 is a resident of the State of California.

284.    Plaintiff John Doe 214 attended OSU from 1980-1985 and was a member of the swimming team for 4 years while he attended OSU.

285.    Strauss treated John Doe 214 approximately 20 times while John Doe 214 was a student athlete on the swimming team at OSU. Of those 20 times, Strauss sexually assaulted/abused John Doe 214 15 times. Strauss sexually assaulted/abused John Doe 214 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 214's genitals in a manner that made John Doe 214 feel very uncomfortable. The exams were extremely long and Strauss would always grab John Doe 214's penis and manipulate it during the exams while looking closely at it. John Doe 214 developed a hernia and Strauss required him to come back for frequent genital exams that continually got longer and more uncomfortable.

286.    John Doe 214 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. John Doe 214 also recalls once occurrence where Strauss came into his hotel room when they were away for a swim meet. In the room, Strauss said he needed to rub John Doe 214 so he did not have any cramps. During this, Strauss slid his hand up John Doe 214's thigh grabbing John Doe 214's penis and testicles.

287.    The exams involved Strauss trying to arouse John Doe 214.

288.    John Doe 214 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 214 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 214. And John Doe 214 was raised to believe that doctors help their patients, not hurt them.

289.    Before May 15, 2019, John Doe 214 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 214 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 214 on notice that Strauss was a sexual predator.

290.    Before May 15, 2019, John Doe 214 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

291.    After May 15, 2019, John Doe 214 learned that Strauss' examinations in which Strauss manipulated John Doe 214's genitals were medically unwarranted, improper, and even criminal. John Doe 214 also learned that Strauss was a serial sexual offender. Then John Doe 214 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

292.    OSU showed more than deliberate indifference by placing John Doe 214 under Strauss' care. OSU betrayed John Doe 214 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 214 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

293.     Further, before contacting and retaining his attorney in May 2021, John Doe 214 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 214 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 214 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 214 on notice that Strauss was a sexual predator.

294.     Before contacting and retaining his attorney in May 2021, John Doe 214 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 214 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 214 also learned that Strauss was a serial sexual offender. Then John Doe 214 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 214 and assaulted many other Ohio State students.

295.     Plaintiff John Doe 215 is a resident of the State of Virginia.

296.     Plaintiff John Doe 215 attended OSU from 1990-1996.

297.     Strauss treated John Doe 215 approximately 6 times while John Doe 215 was a student at OSU. Of those 6 times, Strauss sexually assaulted/abused John Doe 215 2 times. Strauss sexually assaulted/abused John Doe 215 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 215's genitals in a manner that made John Doe 215 feel very uncomfortable. John Doe 215 went to see Strauss for genital warts

and he made comments about the color and shape of John Doe 215's genitals. Strauss also kept grabbing John Doe 215's testicles and moving his penis up and down while Strauss rubbed his fingers under his John Doe 215's testicles.

298.    John Doe 215 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 215.

299.    John Doe 215 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 215 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 215. And John Doe 215 was raised to believe that doctors help their patients, not hurt them.

300.    Before May 15, 2019, John Doe 215 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 215 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 215 on notice that Strauss was a sexual predator.

301.    Before May 15, 2019, John Doe 215 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

302.    After May 15, 2019, John Doe 215 learned that Strauss' examinations in which Strauss manipulated John Doe 215's genitals were medically unwarranted, improper, and even criminal. John Doe 215 also learned that Strauss was a serial sexual offender. Then John Doe 215 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

303.     OSU showed more than deliberate indifference by placing John Doe 215 under Strauss' care. OSU betrayed John Doe 215 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 215 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

304.     Further, before contacting and retaining his attorney in May 2021, John Doe 215 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 215 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 215 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 215 on notice that Strauss was a sexual predator.

305.     Before contacting and retaining his attorney in May 2021, John Doe 215 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 215 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 215 also learned that Strauss was a serial sexual offender. Then John Doe 215 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 215 and assaulted many other Ohio State students.

306.     Plaintiff John Doe 216 is a resident of the State of Ohio.

307.     Plaintiff John Doe 216 attended OSU from 1994-1996 and 2007-2008.

308.     Strauss treated John Doe 216 approximately 1 time while John Doe 216 was a student at OSU between 1994-1995. Strauss sexually assaulted/abused John Doe 216 1 time. Strauss sexually assaulted/abused John Doe 216 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 216's penis and testicles in a manner that made John Doe 216 feel very uncomfortable.

309.     John Doe 216 recalls Strauss giving him an extended physical even though he was seeing him for an unrelated sickness or ailments. The exam involved Strauss trying to arouse John Doe 216.

310.     John Doe 216 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 216 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 216. And John Doe 216 was raised to believe that doctors help their patients, not hurt them.

311.     Before May 15, 2019, John Doe 216 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 216 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 216 on notice that Strauss was a sexual predator.

312.     Before May 15, 2019, John Doe 216 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

313.     After May 15, 2019, John Doe 216 learned that Strauss' examination in which Strauss manipulated John Doe 216's genitals was medically unwarranted, improper, and even criminal. John Doe 216 also learned that Strauss was a serial sexual offender. Then John Doe

216 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

314. OSU showed more than deliberate indifference by placing John Doe 216 under Strauss' care. OSU betrayed John Doe 216 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 216 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

315. Further, before contacting and retaining his attorney in May 2021, John Doe 216 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations. John Doe 216 was not aware of prior, credible allegations that Strauss had sexually assaulted other students. No action taken by Strauss put John Doe 216 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 216 on notice that Strauss was a sexual predator.

316. Before contacting and retaining his attorney in May 2021, John Doe 216 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 216 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 216 also learned that Strauss was a serial sexual offender. Then John Doe 216 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 216 and assaulted many other Ohio State students.

317.    Plaintiff John Doe 217 is a resident of the State of Ohio.

318.    Plaintiff John Doe 217 attended OSU from 1992-1997.

319.    Strauss treated John Doe 217 approximately 1 time while John Doe 217 was a student at OSU. Strauss sexually assaulted/abused John Doe 217 1 time. Strauss sexually assaulted/abused John Doe 217 by conducting a long genital exam where Strauss excessively fondled and moved his hands around John Doe 217's genitals in a manner that made John Doe 217 feel very uncomfortable. John Doe 217 originally went to see Strauss for an STD check and Strauss pulled out a large swab to shove down his urethra. Strauss then said he needed to see if there was any infection in his penis and stroked and squeezed his penis for an extended period of time.

320.    The exam involved Strauss trying to arouse John Doe 217.

321.    John Doe 217 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 217 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 217. And John Doe 217 was raised to believe that doctors help their patients, not hurt them.

322.    Before May 15, 2019, John Doe 217 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 217 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 217 on notice that Strauss was a sexual predator.

323.    Before May 15, 2019, John Doe 217 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

324.    After May 15, 2019, John Doe 217 learned that Strauss' examination in which Strauss manipulated John Doe 217's penis was medically unwarranted, improper, and even criminal. John Doe 217 also learned that Strauss was a serial sexual offender. Then John Doe 217 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

325.    OSU showed more than deliberate indifference by placing John Doe 217 under Strauss' care. OSU betrayed John Doe 217 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 217 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

326.    Further, before contacting and retaining his attorney in May 2021, John Doe 217 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 217 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 217 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 217 on notice that Strauss was a sexual predator.

327.    Before contacting and retaining his attorney in May 2021, John Doe 217 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 217 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 217 also learned that Strauss was a serial sexual offender. Then John Doe 217 learned that

Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 217 and assaulted many other Ohio State students.

STRAUSS

328.    OSU employed Richard Strauss, M.D., as a faculty member from September 1978 until March 1, 1998.

329.    In 1978, Strauss was hired as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine.

330.    By 1980, Strauss was Associate Director of the Sports Medicine Program.  In 1981, Strauss began an appointment in the Athletics Department and expanded his clinical duties to the Sports Medicine Clinic at University Health Services.  By 1982, Strauss' primary affiliation was with the Department of Preventive Medicine.

331.    OSU granted Strauss tenure as an associate professor in 1983. OSU made Strauss a full professor with tenure in 1992.  Strauss voluntarily retired in March 1998 and was approved by the Board of Trustees for emeritus status in the School of Public Health. Emeritus status was granted without the review or approval of the Dean of the College of Medicine and Public Health. (Report, p. 31,32.)

332.    Throughout his employment, Strauss provided medical services to various OSU sports teams.  Strauss initially served as a team physician for the wrestling, swimming, and gymnastics teams, which were based at Larkins Hall.  At that time, Larkins Hall was OSU's physical education building and aquatics facility.

333.    "Over the years, Strauss' responsibilities as a team physician expanded beyond just the teams based out of Larkins, and included assignments with teams and in facilities across

campus[,]" (Report at 2.) Around 1980, Strauss began treating patients at the Sports Medicine Clinic at Student Health Services. He was ultimately appointed Chief Physician of the Sports Medicine Clinic.  As time went on, Strauss treated students "who participated in a wide range of sports including hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football." (*Id.* at 34).

334.     Strauss' appointment with Student Health ended in 1996 following an investigation into student complaints about Strauss' sexual misconduct during medical exams.

<u>STRAUSS' ACTS OF SEXUAL ASSAULT AND ABUSE</u>

335.     Strauss used his position of trust and confidence to regularly and systematically sexually assault, abuse, batter, molest, and harass students, student-athletes, non-students as young as 14 invited onto the campus, non-students on OSU sponsored trips off-campus to high schools throughout Ohio, and others over the course of his career in his capacity as an employee, agent, and/or representative of OSU.

336.     Without OSU's imprimatur, Strauss would not have had access to the OSU students and others upon whom he preyed.

337.     Strauss abused Plaintiffs and OSU students in one or more of the following ways (as categorized by the Report):

    a.  In the context of a medical examination that caused the student to reach ejaculation or nearly reach ejaculation;

    b.  In the context of a medical examination that caused the student to reach erection or nearly reach erection;

    c.  Unnecessary fondling or groping of genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum.

     d.   Examination techniques that included: unnecessary nudity; excessive touching of non-genital/non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside a clinical setting; and *quid pro quo* arrangements; and

     e.   Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student-athletes' locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (Report at 39)

338.    Ohio Revised Code 2907.02 defines rape, in relevant part, as "engag[ing] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

339.    In turn, Ohio Revised Code 2907.01 defines "sexual conduct" in relevant part as the insertion of any part of the body into the anus of another.

340.    Strauss inserted his finger into the anus of countless young men.

341.    Strauss longingly moved his finger in and all around their anuses for his own sexual pleasure.

342.    Strauss had no legitimate medical reason to do this to young men even if it was not for Strauss' sexual gratification.

343.    Ohio Revised Code 2901.01 defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

344.    At other times, Strauss put his penis inside young men when they were under medication.

345.     Strauss used his authority and the positioning of these young men when OSU left them alone in his examination room to force them to endure digital anal rape.

346.     Strauss raped these young men.

347.     Strauss raped their lives.

348.     Strauss committed these acts of sexual abuse and harassment consistently and on a daily basis throughout his career at OSU.

349.     With their collegiate athletic careers and scholarships on the line, many athletes sought treatment from Dr. Strauss for a required physical or for treatment of other physical conditions, at a high cost to their mental and emotional health.

350.     Strauss committed these acts of sexual abuse while an OSU faculty member.

WHY PLAINTIFFS HAD DIFFICULTY REALIZING OR
REPORTING STRAUSS' CONDUCT AS SEXUALLY ABUSIVE

351.     Plaintiffs were vulnerable to Strauss' sexual abuse, and many were not able to identify Strauss' conduct as sexual abuse when it occurred. Many factors caused this result, as set forth below.

352.     Plaintiffs were treated by Strauss in his capacity as a Team Physician through the Athletics Department or at the Sports Medicine Clinic. He was the person officially designated to treat them.

353.     Plaintiffs had to pass a pre-season physical in order to participate in their sport.

354.     Before attending OSU, some Plaintiffs had not seen a doctor without their parents being present.

355.     Plaintiffs tended to attribute Strauss' surprisingly "rigorous" genital and rectal examinations to the fact that the physical requirements of intercollegiate sports were much greater than for high school competition.

356.    Plaintiffs were sexually assaulted/abused by Strauss in the context of a purported medical examination, such as when seeing him for a pre-season physical or for a sports-related injury.  They came into contact with him under legitimate circumstances and were more likely to interpret what took place in the examination room within that framework of legitimacy.

357.    When Strauss abused Plaintiffs, male sexual abuse was not a commonly acknowledged problem or a commonly discussed topic among non-educators or people outside the fields of medicine and counseling.

358.    Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

359.    Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

360.    Plaintiffs treated by Strauss were placed in a vulnerable position, both physically and emotionally, when Strauss examined them. They were not psychologically predisposed to question Strauss' clinical practices.

361.    There was a huge disparity between Strauss' medical knowledge and the Plaintiffs.  They had no standing to challenge his explanations for the things he did to them.

362.    Plaintiffs were on Strauss' "turf" when he examined them in his office with the door closed.  Strauss' psychological and educational advantage over each athlete in the examination room was just as great as the athlete's physical advantage over Strauss would have been if they had competed against each other in the athlete's chosen sport.

363.    Plaintiffs went into exams, particularly pre-season physicals, expecting their doctors to touch them.  They knew that doctors often have to touch their patients as part of their work.  Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

364. Plaintiffs attended OSU believing its doctors and medical faculty would inform patients about the medical services they provided to them to the extent they were legally or ethically required to do so.

365. Plaintiffs entered Strauss' examination rooms presuming that what occurred in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because such topics were embarrassing to discuss. When Strauss' examinations became overly aggressive or lingered too long in intimate areas, it made more sense for Plaintiffs to chalk a feeling that something was wrong up to them feeling unwarranted embarrassment or shame. The alternative was to accuse a tenured professor of committing sexual assault and to risk one's athletic scholarship.

366. Plaintiffs maintained a special relationship with OSU because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school. They despised Strauss' medical exams but were willing to endure them if that was a requirement to keep their scholarships.

367. Plaintiffs maintained a team mentality. No teammate wanted to complain about something he believed his other teammates were having to endure, no matter how unpleasant the experience.

368. Some Plaintiffs feared being ridiculed and ostracized if they complained to teammates about the sexual undertones they perceived during Strauss' medical examinations and their teammates did not admit to having similar experiences with Strauss.

369. OSU teams always compete at the highest possible level. Plaintiffs were therefore expected to perform at their best. That required Plaintiffs to make sacrifices and go the extra mile with every aspect of their training and preparation. Plaintiffs were not in a position to judge

whether a reputed world-class sports physician's overly thorough examinations were improper just because things felt wrong or overly invasive. Plaintiffs thought Strauss to be an elite sports doctor, just like they were elite athletes. Plaintiffs also thought that OSU was a reputable and renowned institution that would protect the interests and well-being of their student athletes and act on any reports of inappropriate behavior by their faculty. Strauss' "thoroughness" felt, extreme, embarrassing, and humiliating to the Plaintiffs, but Plaintiffs believed his physicals were a difficult step forward in their quest for excellence and thought that OSU would have stopped the behavior if it was not furthering that quest.

370.    Plaintiffs, as athletes, were expected to be tough and not to complain.

371.    OSU controlled every aspect of how Strauss interacted with the Plaintiffs. OSU provided the facilities, designated Strauss as their doctor, and controlled their scholarships. Plaintiffs had no say in who treated them.

372.    To the extent any Plaintiffs may have complained about this conduct by Strauss, OSU failed to act upon or otherwise dismissed these concerns.

373.    None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating hernias, swollen lymph nodes, or hamstring tears, or medical conditions of the penis, testicles, rectum, prostate, or anus.

374.    None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

375.    None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

376.     When Strauss sexually assaulted/abused Plaintiffs in a clinical setting, many of them felt confused as to whether abuse had, in fact, occurred.  While Plaintiffs had strong negative emotions and many felt his exams were medically inappropriate, they also understood that feelings are not facts. Many of them did not appreciate until within the past two years that Strauss touched them in an unlawful manner.

377.     Plaintiffs were expressly or impliedly misled by OSU trainers, coaches, and employees in the Athletics Department into believing that Strauss' sexually abusive examination methods and statements, though unpleasant and embarrassing, were medically acceptable practices.

378.     Plaintiffs were unlikely to think Strauss was committing an act of sexual violence by manipulating their genitals for extended periods because everyone talked openly about Strauss' over-the-top Strauss' genital exams. To a young college student, how could something discussed so openly actually be a criminal act?  Strauss' insistence upon his rigorous genital and rectal exams became an accepted, albeit despised, part of being treated.  Plaintiffs' only recourse was to make nervous jokes in light of their powerlessness over their predicament. A Plaintiff recalls that during his freshman physical, teammates outside Strauss' closed examination room laughed that it was Plaintiff's "first time" – as though Plaintiff was losing his virginity.

379.     Not until within the two years before filing the original Complaint have Plaintiffs had a reasonable basis for believing OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.

380.     Not until within the two years before filing the original Complaint have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately indifferent to

the substantial risk that Strauss was sexually abusing them and other male OSU students, particularly student-athletes.

381.    Left to their own means, Plaintiffs had no reasonable way of knowing that OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.  Plaintiffs also had no way of learning the awful truth about what OSU knew and when, or how OSU chose to permit their continued sexual abuse by Strauss. No exercise of reasonable due diligence would have revealed to them how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Strauss.

382.    What these students didn't know-at the time Strauss abused them, or at any time until the Report came out-was that rather than respond immediately and appropriately to the first report of Strauss's abuse, OSU as an institution deliberately turned a blind eye to sexual harassment, abuse, and misconduct by Strauss for the next twenty years; it had no policies in place for handling or responding to reports of sexual abuse or harassment, it failed to alert authorities, it failed to discipline, fire, revoke or suspend Strauss's privileges, it failed to report him to the medical board, and it kept Strauss's colleagues and supervisors in the dark about how dangerous Strauss was to the student body.

383.    In fact, the Report concludes that even after OSU officials determined that Strauss's conduct was sexually abusive in nature, they allowed him to quietly retire and bestowed him with emeritus status.

384.    Perkins Coie confirmed that treatments provided for students and student-athletes served no medical purpose or justification and only served to inflict extreme mental trauma on his patients.

385.    Like the Plaintiffs in this case, many survivors and loved ones of survivors have described an "awakening" experience upon reading the Report.

386.    For the first time, survivors realized that Dr. Strauss's conduct was not medically necessary and they had not only been betrayed by Strauss, but that they were also betrayed by OSU.

387.    The Report notably found, applicable to the Plaintiffs here, that "[t]his case presented an intersection of two specific types of sexual abuse, both of which have generally not been associated with common social conceptions of sexual abuse[:]…doctor-patient sexual abuse and the sexual abuse of adult males[,]" and concluding that "[p]atients *often* do not report sexual abuse committed by their doctors due to…*confusion as to whether sexual abuse, in fact, occurred."* Report, at 23 (emphasis added).

388.    The Report also found, again applicable to the Plaintiffs here, that it was "***essential***" to "consult with suitably qualified medical experts" "to discern whether, and to what extent, Strauss' physical examinations of student-patients exceeded the boundaries of what was appropriate or medically necessary…" Report, at 24.

389.    OSU's own hired law firm found it reasonable for Strauss' patients to be confused as to whether they were receiving legitimate medical care, and in fact had to consult medical experts, yet OSU claims these young people should have known they were not receiving medical care, *as a matter of law.*

OSU'S DELIBERATE INDIFFERENCE TOWARDS STRAUSS' CONDUCT

390.    "Beginning as early as Strauss' first year at OSU – and persisting throughout his nearly two decades at the school – students and University staff reported and referred complaints about Strauss to various University employees." (Report at 2).

391.    On information and belief, at all times relevant to this Complaint, persons with the authority to cut-off Strauss' access to patients, to prevent Strauss from sexually abusing patients in a clinical setting, or to implement other corrective measures had, at minimum, actual knowledge there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and other male OSU students.

392.    As early as 1979, OSU officials with authority to institute corrective measures had information indicating that Strauss posed "a substantial risk of sexual abuse" to male athletes on OSU's intercollegiate sports teams.  Among other things, "[p]ersonnel in the University's Sports medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations." (Report at 2)

393.    Through administrators, faculty, and staff, OSU had actual notice of Strauss' sexually abusive conduct. OSU, however, dismissed, disregarded, minimized, refuted, denied, silenced, and even concealed complaints about Strauss' sexual misconduct.  At best, OSU chose not to act on information that alerted University faculty, staff, and administrators to a substantial risk that Strauss was sexually abusing Plaintiffs and other male OSU athletes. On information and belief, OSU personnel who were alerted to compelling evidence of Strauss' sexually predatory conduct, but failed to take meaningful action that could have prevented Plaintiffs' injuries, include: Athletic Directors, Assistant Athletic Directors and Associate Athletic Directors; and Head Team Physicians and several team physicians (who were also faculty members).

394.    As early as 1979, personnel in the Athletics Department and in the University's Sports Medicine Program knew that Strauss conducted prolonged genital examinations on male

students and refused to allow any OSU personnel to witness the examinations. Such personnel also knew "that Strauss showered alongside the male students at Larkins Hall – a practice unique to Strauss among the other team physicians and a practice that the student-athletes repeatedly complained about to their coaches." (Report at 2)

395.     Additionally, nurses at Student Health Services worried that Strauss was engaging in sexual conduct with patients because he often showed up unannounced to treat patients not on the schedule, took unusually long times examining them, conducted examinations behind closed doors, and failed to fill out medical records documenting the medical services he provided.

396.     Strauss was never disciplined for failing to create or complete medical records, even though such records are standard medical practice and important to providing continuity of care.

397.     By failing to insist that Strauss properly document all patient encounters, OSU made it easy for Strauss to lie about every aspect of what took place during patient visits, or even to deny that he had treated a particular student.

398.     OSU never told Strauss to stop showering with the athletes.

399.     OSU never ordered Strauss to have a third person in the room whenever he was treating a male patient.

400.     OSU did not diligently follow up on any of the rumors or reports regarding Strauss until 1994.

401.     At all relevant times, OSU also did not have a meaningful complaint or dispute resolution process for allegations of faculty sexual harassment or abuse.  On information and belief, OSU's faculty dispute procedure instructed complainants to attempt an informal resolution, i.e., a mediation, with the faculty member at issue before going through other

channels. It made no sense to recommend that victims of sexual abuse and harassment try to

negotiate a resolution with their abusers before seeking formal redress.

402.     At the end of the day, OSU failed the Plaintiffs and Strauss' other victims in every

imaginable way. It effectively gave Strauss a green light to prey upon male OSU students as he

saw fit.  Strauss took full advantage of every opportunity OSU gave him to assault, abuse, and

harass Plaintiffs and other male OSU students.

CONDITIONS AT LARKINS HALL

403.     During the Strauss years, Larkins Hall was in and of itself a constant source of

sexual harassment for the male members of the athletics teams based inside it. Larkins Hall was

home to a number of OSU sports teams, including wrestling, gymnastics, and swimming.  While

Strauss participated in the sexual harassment that took place in Larkins Hall, he did not

independently create the sexually hostile environment that affected the Plaintiffs.

404.     All male university faculty and students were allowed to use the same showers as

the wrestling team.  An aggressively voyeuristic culture developed where certain non-athletes

showered at the same time as wrestlers and soaped their groins vigorously while watching the

wrestlers shower.  These individuals, including Strauss, leered at the wrestlers while watching

them shower. The voyeurs often stayed in the showers until all the wrestlers had finished – often

for an hour or longer.  Some of these individuals were OSU faculty. When the wrestling team

changed its practice time, many of the voyeurs shifted their shower times to coincide with the

wrestling team's new schedule.

405.     Wrestlers were frequently approached in the bathroom and showers and

propositioned for sexual encounters.  One Plaintiff even had notes put in his locker asking him to

meet up for sex.

406.    The harassment was so constant that one wrestler called getting to and from the showers "running the gauntlet."

407.    The wrestling room and spaces around it, including the bathroom and a stairwell, became a popular hangout for sexual encounters. Coach Hellickson found people having sex in a bathroom stall, in a stairwell, in the wrestling room, and in other areas. It was not uncommon for Hellickson to see people engaging in sexual activity inside Larkins Hall.

408.    One of the Plaintiffs, a wrestler, was sexually assaulted by a man who grabbed and tried to fondle him as the wrestler was showering. The resulting physical confrontation worried Hellickson about the possibility things might get violent in the future. Larkins Hall was not a safe space for the male athletes who shared lockers or facilities with non-team members.

409.    Hellickson repeatedly complained to OSU administrators about the environment in Larkins Hall because the conditions seriously impacted the psyche and morale of his wrestlers.

410.    Hellickson requested a separate team shower area. OSU denied his request.

411.    Hellickson begged to have the wrestling team moved to another building. OSU denied his request.

412.    When Hellickson tried to get people to leave because they were ogling the wrestlers and taking hour-long showers, they said it was their right to shower when and for as long as they wanted.  They denied staring at the wrestlers. University police would not make them leave.

413.    Larkins Hall became an unsafe space and sexually hostile environment for wrestlers and some of the other male athletes whose teams were based there.

**CLAIM FOR RELIEF**
**COUNT I: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*
**Heightened Risk Clakm**

414. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

415. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

416. Title IX is implemented through the Code of Federal Regulations. See 33 C.F.R. Part 106. 33 C.F.R. § 106.8(b), which provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

417. As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

418. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

419. Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

420. At all relevant times, OSU received federal financial assistance and is therefore subject to Title IX.

421. Title IX required OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

422.    Strauss committed his unlawful acts while working for OSU as a tenured faculty member, Team Physician, and Sports Medicine Physician.

423.    Strauss' sexual assault, abuse, molestation, and harassment of Plaintiffs—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

424.    OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of sexually abusive or harassing behavior by Strauss.

425.    OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Strauss.

426.    Specifically, OSU knew about Strauss' sexual assault, abuse, and molestation through OSU personnel with authority to take corrective action to address it. Such personnel included but were not limited to: Athletic Directors and Assistant Athletic Directors, and Head Team Physicians and several team physicians (who were also faculty members).

427.    Throughout Strauss' 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Strauss' inappropriate sexual conduct.

428.    Given the magnitude of Strauss' abuse—involving students and student- athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Strauss' sexual abuse.

429.    Nonetheless, OSU did nothing to address the complaints and concerns about Strauss.

430. OSU's failure to respond promptly and adequately to allegations of Strauss' abuse constitutes sex discrimination, in violation of Title IX.

431. By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other male OSU students were experiencing. OSU's deliberate indifference included, without limitation:

    a. Failing to respond to allegations of Strauss' sexual assault, abuse, and molestation;

    b. Failing to promptly and adequately investigate allegations of Strauss' sexual assault, abuse, and molestation;

    c. Requiring male athletes to see Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Strauss' abuse;

    d. Allowing Strauss (and other sexual predators) to roam freely in Larkins Hall;

    e. Allowing Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Strauss' abuse of male student-athletes;

    f. Failing to adequately supervise Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

    g. Failing to require that Strauss properly document all patient encounters;

    h. Failing to take corrective action to prevent Strauss from sexually assaulting, abusing, and molesting other students; and

    i. Failing to have in place an effective sexual harassment policy that allowed students to bring complaints without first having to try to resolve complaints of sexual harassment informally with the alleged abuser.

432.    OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss' sexual misconduct caused Plaintiffs (and other male OSU students) to experience further sexual harassment and/or made them vulnerable to it.

433.    OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss' sexual misconduct created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

434.    As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred various personal expenses.

## COUNT II: Violation of Title IX
## 20 U.S.C. § 1681(a), *et seq.* Hostile Environment

435.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

436.    Plaintiffs whose teams were based out of Larkins Hall between 1978 and 1998 (collectively "Larkins Plaintiffs") were entitled to use the athletics facilities free from sexual harassment.  However, the pervading and constant sexual harassment they received within Larkins Hall created a hostile environment. The hostile environment these Larkins Plaintiffs suffered in Larkins Hall facilities was so severe, pervasive, and objectively offensive that it effectively barred said Larkins Plaintiffs from access to numerous educational opportunities and

benefits, including but not limited to: full use and enjoyment of practice facilities, showers, and locker rooms; and full use and enjoyment of their athletic scholarships and memberships on OSU's sports teams.

437. The sexually hostile environment inside Larkins Hall during the aforementioned period constituted sex discrimination in violation of Title IX.

438. Between 1978 and 1998, OSU officials in a position to implement corrective measures had actual knowledge that the Larkins Plaintiffs and other male OSU student-athletes were being subjected to a sexually hostile and abusive environment inside Larkins Hall.

439. OSU owed the Larkins Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

440. Such OSU officials showed deliberate indifference towards the safety of the Larkins Hall Plaintiffs and other male student-athletes who used the Larkins Hall facilities between 1978-1998.

441. OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

442. As a direct and proximate result of OSU's violation of the Larkins Plaintiffs' rights under Title IX, the Larkins Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and incurred various personal expenses.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter judgment in favor of Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(b)     Enter judgment in favor of the Larkins Plaintiffs on their claim for discrimination under Count II Title IX against Defendant The Ohio State University;

(c)     Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(e)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(f)     Award Plaintiffs pre-judgment and post-judgment interest;

(g)     Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 41 U.S.C. § 1988(b); and

(h)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,


*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile
rschulte@yourlegalhelp.com

*/s/ Michael L. Wright*
**Michael L. Wright (0067698)**
**WRIGHT & SCHULTE, LLC**
130 W. 2nd Street, Suite 1600
Dayton, OH 45402
(937) 222-7477
(937) 222-7911 facsimile
mwright@yourohiolegalhelp.com

*/s/ Ben Crump (pro hac to be applied for)*
**Ben Crump (FL # 72583)**
**BEN CRUMP LAW, PLLC**
122 S. Calhoun St.
Tallahassee, FL 32301
(850) 224-2020
(850) 224-2021 facsimile
ben@bencrump.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this day I served a copy of the foregoing document upon all counsel of record via the Court's CM/ECF system.

*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile